IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

LATISHA ROBINSON, Individually
and as Parent and Natural Guardian of
A.T., a minor

    *Plaintiff*,

    v.

BOARD OF EDUCATION OF
WASHINGTON COUNTY, *et al*.,

    *Defendants*.

Civil No. 1:22-cv-01102-ELH

---

## MEMORANDUM OPINION

A.T. was a six-year-old public school student in the first grade in Hagerstown, Maryland, when she was sexually abused by two female classmates. Thereafter, A.T.'s mother, plaintiff Latisha Robinson, individually and as parent and natural guardian of A.T., filed suit against the Washington County Board of Education (the "BOE" or the "Board"); Dr. Boyd Michael III, the county superintendent[1]; Dana Peake, the principal of the school where the abuse occurred; and Lauren Housel, a teacher at the school. *See* ECF 1. The Amended Complaint (ECF 21) is the operative pleading.[2]

Pursuant to Fed. R. Civ. P. 12(b)(6), the defendants have moved to dismiss Counts II and III of the Amended Complaint. ECF 24 ("Motion").[3] Plaintiff opposes the Motion. ECF 29 ("Opposition"). Defendants have replied. ECF 34 ("Reply").

---

[1] Dr. Michael retired in July 2022, after 43 years of service. ECF 24 at 1 n. 1.

[2] The Amended Complaint generally refers to Ms. Robinson as the sole plaintiff. But, some of the submissions refer to "plaintiffs," *i.e.*, Ms. Robinson and A.T. In general, I shall refer to Ms. Robinson as the "plaintiff."

[3] Although defendants have not moved to dismiss Counts I, IV, and IV of the Amended Complaint, they did not file an answer as to those counts. However, "the majority view [is] that a

No hearing is necessary to resolve the Motion. *See* Local Rule 105.6. For the reasons that follow, I shall grant the Motion in part and deny it in part.

## I.      Procedural Background

The Complaint (ECF 1) contained five counts. In particular, plaintiffs asserted a claim against the Board for violation of Title IX of the Education Amendments Act of 1972, 20 U.S.C. §§ 1681 *et seq.* (hereafter, "Title IX") (Count I); a claim pursuant to 42 U.S.C. § 1983 for failure to train, lodged against the Board, Michael, and Peake (Count II); a § 1983 claim against the Board, Michael, and Peake alleging "State-Created Danger" (Count III); a claim of negligence, asserted against all defendants (Count IV); and a claim of negligent supervision, monitoring, and training, lodged against the Board, Michael, and Peake (Count V).

Defendants moved to dismiss Counts I, II, III, and V of the Complaint, pursuant to Fed. R. Civ. P. 12(b)(6). ECF 4. In addition, they sought to dismiss Count IV, to the extent that it asserted a claim of educational malpractice. *Id.* They otherwise answered the suit. ECF 5. In the opposition (ECF 11), plaintiff sought leave to amend Counts II and III to add claims against Michael and Peake in their individual capacities.

By Memorandum Opinion (ECF 18) and Order (ECF 19) of March 14, 2023, I denied the motion to dismiss as to Counts I, IV, and V, but I granted it as to Count II and III as to the Board, as well as to Michael and Peake in their official capacities. *See Robinson v. Bd. of Educ. of Washington Cty.*, ELH-22-01102, 2023 WL 2499854 (D. Md. Mar. 14, 2023). But, I also granted

─────────────────────

partial motion to dismiss stays the time to file a responsive pleading.*" Singhal & Company, Inc. v. VersaTech, Inc.,* JKB-19-01209, 2019 WL 4120434, at *6 n.2 (D. Md. Aug. 28, 2019); *see also Saman v. LBDP, Inc.*, DKC-12-1083, 2012 WL 5463031, at *4 n.1 (D. Md. Nov. 7, 2012); *Tingley Systems, Inc. v. CSC Consulting, Inc.*, 152 F. Supp. 2d 95, 122 (D. Mass. 2001). And, in the Motion, defendants reference their Answer to the original Complaint. *See, e.g.,* ECF 24 at 3 (citing ECF 5, ¶ 43).

plaintiff leave to amend the suit to add claims against Michael and Peake in their individual capacities. *Id.*

The Amended Complaint followed on April 4, 2023. ECF 21. The substantive allegations in the Amended Complaint concerning Counts I, IV, and V are largely the same as the allegations in the Complaint.[4] But, plaintiff now alleges that Michael was tasked with "supervising and running the Board of Education." ECF 21, ¶ 16.  And, Count II now names only Peake as a defendant, *id.* at 23, and it no longer contains language concerning "Failure to Train." *Compare* ECF 1 at 23. Similarly, Count III now names only Michael as a defendant, and it replaces the language indicating liability for "State-Created Danger," *id.* at 25, with "Supervisory Liability." ECF 21 at 25.

In addition, the Amended Complaint indicates that Michael has been sued in his individual capacity.  *Id.* at 25.  But, plaintiff does not expressly sue Peake in her individual capacity.  *See id.* at 23.  And, plaintiff no longer alleges: "At all times relevant, Michael acted within the scope of his employment as an agent and servant of the Board of Education." ECF 21-2, ¶ 16.

---

[4] Although plaintiff submitted a redlined version of the Amended Complaint, as required, it is not always apparent which text is new.  *See* ECF 21-2. For example, in the redlined version of the Amended Complaint, paragraph 88 appears to be a new allegation. *Id.* ¶ 88.  Yet, paragraph 88 in the Amended Complaint is identical to paragraph 88 in the Complaint.  Moreover, the redlined version of Count II and Count III does not always reflect what has been deleted.

## II.  Factual Background[5]

In the fall of 2019, A.T. was six years of age and a student in the first grade at Ruth Ann Monroe Primary School (the "School").  ECF 21, ¶ 37.[6]  Housel was A.T.'s teacher.  *Id.*  A.T. "generally enjoyed attending school and learning." *Id.*

Housel sent a text message to plaintiff on November 6, 2019, expressing concern about A.T.'s classroom conduct.  *Id.* ¶¶ 37, 38.  Housel noted that "A.T. often spent time playing in the back of the classroom with Student A instead of learning in her seat during math class." *Id.* ¶ 39. Housel sent a second message to plaintiff on or about November 13, 2019.  ECF 5, ¶ 38.[7]

Ms. Robinson became concerned about A.T.'s classroom environment "after receiving two messages of this nature" from Housel.  ECF 21, ¶ 40.  Therefore, she contacted Housel on or about November 13, 2019, and asked to move A.T. to a different class to separate her from Student A. *Id.*  ¶ 40.[8]  Housel responded on November 18, 2019.  *Id.*  She informed plaintiff that she had spoken to the administration and that moving A.T. to another class "'would be a process.'" *Id.* ¶ 40. Ms. Robinson claims that no further action was taken with respect to her request. *Id.*

---

[5] At this juncture, the Court assumes the truth of the allegations in the Amended Complaint. *See Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019).

[6] Defendants assert that the School is subsidized under "Title I, Part A of the Elementary and Secondary Education Act, as amended by the Every Student Succeeds Act." ECF 24 at 2 n.3.

[7] Plaintiff claims that she received two messages from Housel.  ECF 21, ¶ 40.  But, the Amended Complaint is unclear as to when the second message was transmitted.

[8] Defendants admit that plaintiff "raised the possibility of moving A.T. to another class," but state that the request was sent on November 15, 2019, rather than November 13, 2019. ECF 5, ¶ 40.  The discrepancy is immaterial.

Also in the fall of 2019, A.T.'s father noticed that A.T. was engaging in sexualized behavior. *Id.* ¶ 41. He claims that A.T. "started kissing his other children on the mouth and was talking about 'boyfriends and girlfriends.'" *Id.*[9]

Then, on December 4, 2019, Ms. Robinson "received a phone call from [the School] requesting that she come in and meet with Housel and Peake immediately." *Id.* ¶ 42. At the meeting, at which A.T. was present, Peake informed plaintiff that A.T. had "'made a bad decision'" and "'took nude photos of herself'" in the School bathroom, using a school iPad. *Id.* Housel indicated that the images were discovered based on a report from another student. *Id.* But, A.T. later told her mother "that student A had instructed her to take the photographs." *Id.* ¶ 43.

Ms. Robinson subsequently received a call from Stephen Pittman, a Child Protective Services employee for the Washington County Department of Social Services. *Id.* ¶ 44.[10] Plaintiffs met with Pittman and a social services victim advocate, Victoria Morrison, on December 10, 2019. *Id.* ¶ 45. Pittman interviewed A.T. while "Morrison asked plaintiff questions about A.T., their home, and plaintiff's own childhood." *Id.*

Thereafter, Pittman "informed Plaintiff that A.T. had been sexually abused by other students in her class. . . ." *Id.* ¶ 46. He explained that School employees "discovered the abuse" because some of the incidents were "video-recorded" on "the school-issued classroom iPad." *Id.* He also indicated that Housel found photographs of A.T. in the "deleted folder on the classroom iPad . . . ." *Id.* The School subsequently "examined" all 200 of the School iPads. *Id.* Videos of

---

[9] It appears that A.T.'s parents do not reside together.

[10] Defendants assert that on December 4, 2019, in response to discovering the photographs, they contacted the school's resource officer, who was also a member of the Washington County Sheriff's Department, as well as the Department of Social Services. ECF 5, ¶ 43. Further, defendants claim that those two departments proceeded to collect "all of the pertinent evidence and conducted the investigation into the students' activities." *Id.*

A.T. and two other female students were found in the "'Deleted' folder" on "at least one of the devices." *Id.*.

Moreover, Pittman stated that at least five videos were recorded on different dates during the fall semester of 2019, including November 15, 2019. *Id.* ¶¶ 48, 50. Each video involved A.T., student A, and at least one other child. *Id.* ¶ 48. The videos showed the children "engaged" in "licking" of each other's genitals and "kissing." *Id.* ¶ 47. And, "the videos showed the other children kissing A.T. on the mouth and licking her vaginal and genital area . . . ." *Id.* According to Pittman, all of the incidents recorded on the videos "took place in Housel's classroom, behind a bookshelf, in the back of the classroom." *Id.* ¶ 48.

Upon learning of the sexual abuse of A.T., plaintiff attempted to contact Peake to obtain more information and to determine how the school planned "to protect A.T." *Id.* ¶ 54. Plaintiff alleges that Peake never responded. *Id.* Robinson also claims that defendants did not "reach out" to her or A.T. to investigate the incidents. *Id.* ¶ 55. Further, plaintiff asserts that defendants "made no efforts to move A.T. to another class, offer her any counseling services, provide her with additional academic assistance or accommodations, or offer A.T. any other means of support or additional security to prevent future incidents of sexual abuse at school." *Id.* ¶ 56. And, plaintiff claims, even after the abuse was discovered, "A.T. remained in Housel's class" with her abusers, without any attempt by defendants "to separate" A.T. from "the other female classmates who abused her." *Id.* ¶ 59.

Plaintiff attempted to register A.T. for another Washington County public elementary school, because of her concerns about A.T.'s safety at the School. *Id.* ¶ 60. On December 18, 2019, plaintiff received a letter from the school to which she had applied for a transfer, denying admission because "'an investigation was still underway.'" *Id.* ¶ 60. The letter directed plaintiff to

contact Peake for more information. *Id.* But, plaintiff alleges that "when [she] called Peake, she never received a response." *Id.*

Robinson asserts that she wrote to the BOE to inquire as to the status of the investigation and to inform the Board that she could not send A.T. to School until measures were taken to assure A.T.'s safety. *Id.* ¶ 62. In a letter of January 10, 2020, the Board claimed that it was unable to provide plaintiff "with any further information" about the matter, but that "it was taking the matter very seriously." *Id.*

Plaintiff claims that by February 2020, she still had not received any information as to safety measures that defendants "planned to take" for A.T. or "the status of the investigation." *Id.* ¶ 63. Therefore, she asserts that she "had no choice but to move herself, A.T., and the remainder of their family to Frederick County so that A.T. could attend" a new public school. *Id.*

Ms. Robinson contends that A.T. was denied the ability to attend public school in Washington County from December 19, 2019 through March 2020. *Id.*[11] And, plaintiff asserts that A.T. has suffered financial loss in order "to move A.T. to another county to receive sufficient public education . . . ." *Id.* ¶ 69.

Plaintiff also complains that the School's personnel failed to "conduct routine reviews of the content" of the School's iPads. *Id.* ¶ 52. Nor did the Board develop and implement policies and procedures pertaining to the monitoring of student use of the devices. *Id.* ¶ 53.

According to plaintiff, A.T. "has suffered and will continue to suffer serious and severe physical and emotional damages of a permanent and lasting nature." *Id.* ¶ 68; *see also id.* ¶ 58. Before the abuse, for example, A.T. excelled in school. *Id.* ¶ 66. However, according to plaintiff,

---

[11] The Court takes judicial notice of the fact that as of March 2020, the public schools in Maryland began to shut down because of the global COVID-19 pandemic. Fed. R. Evid. 201.

the abuse has had a "negative impact" on A.T.'s participation in school programs and her "academic performance." *Id.* ¶ 64. Further, she "suffered psychological and emotional trauma that interfered with her daily functioning," namely, "increased feelings of anxiety and anger, nightmares, flashbacks, intrusive thoughts about the abuse and struggle[s] with eating, sleeping, and concentrating." ¶ 64. "A.T. also began to exhibit sexualized behavior by chatting on the internet with adults in a sexualized manner and taking sexually suggestive photographs of herself at home." *Id.* ¶ 65. Moreover, she "struggles with headaches and stomach aches as physical manifestations of the anxiety and depression she still experiences." *Id.* ¶ 66. And, she "has "developed a form of body dysmorphia where the sight of her own body embarrasses her and makes her feel a sense of shame." *Id.*[12]

### III.  Standard of Review

A defendant may test the legal sufficiency of a plaintiff's complaint by way of a motion to dismiss under Rule 12(b)(6). *Nadendla v. WakeMed*, 24 F.4th 299, 304–05 (4th Cir. 2022); *Fessler v. Int'l Bus. Machs. Corp.*, 959 F.3d 146, 152 (4th Cir. 2020); *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom., McBurney v. Young*, 569 U.S. 221 (2013). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

---

[12] Plaintiff alleges that she provided notice of her claims pursuant to the Local Government Tort Claims Act, Md. Code (2020 Repl. Vol.), § 5-302 *et seq.* of the Courts and Judicial Proceedings Article, as well as the Maryland Tort Claims Act, Md. Code (2021 Repl. Vol.), § 12-101 *et seq.* of the State Government Article. *See* ECF 1, ¶ 9.

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). *See Migdal v. Rowe Price-Fleming Int'l Inc.*, 248 F.3d 321, 325–26 (4th Cir. 2001); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002). That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The purpose of the rule is to provide the defendant with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).

To survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570*; see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted) ("Our decision in Twombly expounded the pleading standard for 'all civil actions' . . . ."); *see also Fauconier v. Clarke*, 966 F.3d 265, 276 (4th Cir. 2020); *Paradise Wire & Cable Defined Benefit Pension Plan*, 918 F.3d at 317–18; *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not 'show[n]' — 'that the pleader is entitled to relief.'" *Id*. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

To be sure, a plaintiff need not include "detailed factual allegations" to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11 (2014) (per curiam). But, mere "'naked assertions' of

wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In other words, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim of relief. *Iqbal*, 556 U.S. at 678. Instead, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, "a court 'must accept as true all of the factual allegations contained in the complaint,' and must 'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (alteration in *Retfalvi*) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)); *see Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015). However, "a court is not required to accept legal conclusions drawn from the facts." *Retfalvi*, 930 F.3d at 605 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see Glassman v. Arlington Cnty.*, 628 F.3d 140, 146 (4th Cir. 2010). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011),

*cert. denied*, 566 U.S. 937 (2012).  But, "[m]ere recitals of a cause of action, supported only by conclusory statements, are insufficient to survive" a Rule 12(b)(6) motion.  *Morrow v. Navy Federal Credit Union*, 2022 WL 2526676, at *2 (4th Cir. July 7, 2022).

When ruling on a Rule 12(b)(6) motion, courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) (citation omitted); *see Bing v. Brio Sys.*, LLC, 959 F.3d 605, 616 (4th Cir. 2020).  But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan*, 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint.*'" *Goodman*, 494 F.3d at 464 (emphasis in *Goodman*) (quoting *Forst*, 4 F.3d at 250).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448). Ordinarily, the court "may not consider any documents that are outside of the complaint, or not expressly incorporated therein[.]" *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013), *abrogated on other grounds by Reed v. Town of Gilbert*, 576 U.S. 155 (2015); *see Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).

11

However, "a court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb v. Mayor and City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015) (citation omitted); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 466 (4th Cir. 2011), *cert. denied*, 565 U.S. 825 (2011); *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). Under Fed. R. Evid. 201, a court may take judicial notice of adjudicative facts only if they are "not subject to reasonable dispute," because they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

## IV.  Discussion

### A.  Section § 1983

Pursuant to 42 U.S.C. § 1983, plaintiff alleges that the Peake and Michael deprived A.T. of her "clearly established constitutionally protected educational rights, equal protection rights, and right to bodily integrity under the Fourteenth Amendment to the United States Constitution." ECF 21, ¶ 95; *see id.* ¶¶ 3–6, 113.

Section 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999). It provides that a plaintiff may file suit against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983; *see, e.g., Nieves v. Bartlett*, 587  U.S. ___, 139 S. Ct. 1715, 1721 (2019); *Filarsky v. Delia*, 566 U.S. 377 (2012); *see also*

*Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379 (4th Cir. 2014), *cert. denied sub nom. Balt. City Police Dep't v. Owens*, 575 U.S. 983 (2015).  § 1983 "'is not itself a source of substantive rights,' but provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)); *see Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017).

To state a claim under § 1983, a plaintiff must allege (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a "person acting under the color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988); *see Davison v. Randall*, 912 F.3d 666, 679 (4th Cir. 2019); *Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011), *cert. denied*, 565 U.S. 823 (2011); *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); *Jenkins v. Medford*, 119 F.3d 1156, 1159–60 (4th Cir. 1997).  "The first step in any such claim is to pinpoint the specific right that has been infringed." *Safar*, 859 F.3d at 245.

"The statutory color-of-law prerequisite is synonymous with the more familiar state-action requirement—and the analysis for each is identical." *Philips*, 572 F.3d at 180 (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 929 (1982)); *see Davison*, 912 F.3d at 679.  A person acts under color of state law "only when exercising power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'"  *Polk Cnty. v. Dodson*, 454 U.S. 312, 317–18 (1981) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)); *see also Philips*, 572 F.3d at 181 (citations and internal quotation marks omitted) ("[P]rivate activity will generally not be deemed state action unless the state has so dominated such activity as to convert it to state action:  Mere approval of or acquiescence in the initiative of a private party is insufficient.").

The Amended Complaint alleges that Peake and Michael were, at all relevant times, acting under color of state law, ECF 21, ¶¶ 89, 100, with a duty, *inter alia*, to refrain from acting in violation of A.T.'s constitutionally guaranteed rights, *id.* ¶¶ 90, 101.  However, plaintiff does not allege that Peake or Michael are liable for failing to prevent the sexual abuse of A.T.  Rather, it is their conduct after learning of the abuse that is in issue.

As discussed in the prior Memorandum Opinion, ECF 18 at 25–27*, § 1983 suits against a state official acting in an official capacity are generally barred, because the official is not regarded as a "person" under 42 U.S.C. § 1983. In contrast, a personal capacity suit, which seeks to impose individual liability on a government official for an action taken under color of state law, is allowed. *Murphy v. Virginia,* 2022 WL 17484286, at *2 (4th Cir. Dec. 7, 2022) (per curiam). But, individual liability must be based on personal conduct. *See Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985).

Notably, there is no liability under § 1983 based on a theory of respondeat superior.  *King v. Riley*, 76 F.4th 259, 269 (4th Cir. 2023).  As the Supreme Court explained in *Iqbal*, 556 U.S. at 677, in a § 1983 suit, "each Government official . . . is only liable for his or her own misconduct." As a result, "a plaintiff must plead that each Government-official defendant, through the official's own individual action, has violated the Constitution."  *Id.* at 676; *see also Younger v. Crowder*, 79 F.4th 373, 381 n.12 (4th Cir. 2023).   Therefore, a supervisor's "mere knowledge" that his subordinates are engaged in unconstitutional conduct is not sufficient to establish a claim.  *Iqbal*, 556 U.S. at 677; *see King*, 76 F.4th at 269; *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001).

Because "liability [under § 1983] is personal, a complaint must contain specific allegations of each individual's conduct . . . ."  *King*, 76 F.4th at 269.   Boilerplate assertions are not sufficient. *Timpson ex rel. Timpson v. Anderson Cnty. Disabilities and Special Needs Bd.*, 31 F.4th 238, 258

14

(4th Cir. 2022); *see also Moss v. Harwood*, 19 F.4th 614, 624–25 (4th Cir. 2021) (in the context of summary judgment, requiring evidence as to each defendant).

Accordingly, the question is whether plaintiff has alleged facts that, if proven, would render Peake or Michael individually liable for "'the deprivation of a federal right . . . .'" *Murphy,* 2022 WL 17484286, at *2 (citation omitted).

### B. Count II (Defendant Peake)

In Count II, plaintiff asserts that Peake violated A.T.'s rights under the Fourteenth Amendment to the Constitution. ECF 21, ¶¶ 88–98. According to plaintiff, Peake, as the principal of the School, "was tasked with adopting, implementing, enforcing, and promulgating policies" and "protocols" of the Board. *Id.* ¶ 89. Plaintiff alleges that Peake violated A.T.'s clearly established constitutional right of "equal access to public education" by "refusing to communicate with A.T.'s mother to discuss [A.T.'s] physical safety at school"; "declining to take measures to prevent future sexual abuse of A.T."; "failing to ensure A.T. would be able to attend another school" in the same district if she could not safely attend the School; and "failing to implement any responsive means after the abuse occurred to ensure that A.T. received equal access to public education." *Id.* ¶ 93. Plaintiff also claims that Peake's actions after becoming aware of the "student-on-student sexual abuse" of A.T., *id.* ¶ 91, "demonstrated a disregard for, and deliberate indifference to," A.T.'s right to "bodily integrity under the Fourteenth Amendment . . . ." *Id.* ¶ 95.

I first consider whether plaintiff has stated a claim against Peake under the Equal Protection Clause of the Fourteenth Amendment. I then consider whether plaintiff has stated a claim against Peake under the Due Process Clause of the Fourteenth Amendment.

**1. Equal Protection**

The Equal Protection Clause of the Fourteenth Amendment provides: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Clause is concerned with disparate treatment "through the enactment, administration, or enforcement" of laws and regulations. *Sylvia Dev. Corp. v. Calvert Cnty.*, 48 F.3d 810, 818 (4th Cir. 1995). In essence, it is "a direction that all persons similarly situated should be treated alike" by the government. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985).

Of relevance here, the Equal Protection Clause has been interpreted to protect a student's "'right to be free from sexual harassment in an educational setting.'" *Feminist Majority Foundation v. Hurley*, 911 F.3d 674, 702 (4th Cir. 2018) (quoting *Jennings v. Univ. of N.C.*, 482 F.3d 686, 701 (4th Cir. 2007)). Indeed, the "[Equal Protection] Clause not only guards against sexual harassment perpetrated by a school administrator against students, [but] also protects students from a school administrator's deliberate indifference that allows such harassment to occur and persist." *Hurley*, 911 F.3d at 702. In addition, the Fourth Circuit has recognized that "a victim of *student-on-student* sexual harassment"—as distinguished from teacher-on-student sexual harassment—"can pursue an equal protection claim predicated on a school administrator's deliberate indifference to such harassment." *Id.* (emphasis added).

"To state an equal protection claim for deliberate indifference to known student-on-student sexual harassment, a plaintiff must first allege that she 'was subjected to discriminatory peer harassment.'" *Id.* (quoting *Stiles ex rel. D.S. v. Grainger Cnty., Tenn.*, 819 F.3d 834, 852 (6th Cir. 2016)). "Second[], the plaintiff must allege that the school administrator 'responded to the discriminatory peer harassment with deliberate indifference, i.e., in a manner clearly unreasonable

in light of known circumstances.'" *Hurley*, 911 F.3d at 702 (quoting *Stiles ex rel. D.S.*, 819 F.3d at 852)). "In other words, the plaintiff must allege that the school administrator knew about harassment of the plaintiff and acquiesced in that conduct by refusing to reasonably respond to it." *Hurley*, 911 F.3d at 702–03 (citation and internal quotation marks omitted). "Third, the plaintiff must allege that the school administrator's deliberate indifference was motivated by a discriminatory intent." *Id.* at 703.

In general, discriminatory intent "implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Sylvia Dev. Corp.*, 48 F.3d at 819 n. 2 (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)). Therefore, "[t]o succeed on an equal protection claim, a plaintiff must . . . demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001*); see also Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 108 (4th Cir. 2011). "Once this showing is made, the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." *Morrison*, 239 F.3d at 654. Courts apply different levels of scrutiny depending on the type of classification. *See id.* at 654–55.

In evaluating a plaintiff's deliberate indifference claim under the Equal Protection Clause, a court may draw on the "'substantial[lly] similar'" deliberate indifference standard applied in Title IX cases. *Hurley*, 911 F.3d at 703 (quoting *Williams ex rel. Hart v. Paint Valley Local Sch. Dist.*, 400 F.3d 360, 369 (6th Cir. 2005)); *see also Hill v. Cundiff*, 797 F.3d 948, 979 (11th Cir. 2015). Deliberate indifference under Title IX "is a high standard that requires more than a showing of mere negligence." *Doe v. Fairfax Cnty. School Bd.*, 1 F.4th 257, 271 (4th Cir. 2021). But, "a

'half-hearted investigation or remedial action will [not] suffice to shield a school from liability.'" *Willey v. Bd. of Educ. of St. Mary's Cnty.*, 557 F. Supp. 3d 645, 662 (D. Md. 2021) (quoting *S.B. ex rel. A.L. v. Bd. of Educ. of Harford Cnty.*, 819 F.3d 69, 77 (4th Cir. 2016)) (alteration in original).

"Further, a school can be liable not only where its deliberate indifference effectively causes the harassment, but also where a school's deliberate indifference made a plaintiff more vulnerable to future harassment." *Willey*, 557 F. Supp. 3d at 662.  Indeed, even "a single, pre-notice incident of severe sexual harassment" can provide a basis for liability, if the school's "response to [that] single incident . . . or lack thereof, was clearly unreasonable and thereby made the plaintiff more vulnerable to future harassment or further contributed to the deprivation of the plaintiff's access to educational opportunities." *Doe*, 1 F.4th at 274.

In *Willey*, 557 F. Supp. 3d at 662, Judge Grimm concluded that a plaintiff had sufficiently pleaded deliberate indifference by alleging that, after the defendant school received notice of the alleged harassment, it "did nothing at all in response:  it did not investigate; it did not counsel; it did not confront; it did not intervene; it did not take the report seriously; it did not discipline; it did not contact [the perpetrator's] parents; it did not take meaningful action; it did not take any remedial action; it did not warn; it did not formulate a plan; it did not train; it did not take precautions; it did not implement protective measures; it did not follow its own policies and procedures; [and] it did not take a single step to ensure [the victim's] safety and wellbeing."

The case of *Hurley*, 911 F.3d 674, is also instructive.  There, a feminist organization and some of its members sued a public university and its current and former presidents, alleging sex discrimination and retaliation, in violation of Title IX and the Equal Protection Clause.  *Id.* at 679. The plaintiffs were the victims of prolonged and vitriolic cyber-sexual bullying and harassment.

*See id.* at 680–84.  They alleged, among other things, that Hurley, the school president, "sought to downplay the harassment and threats, and . . . made no effort to stop them."  *Id.* at 703.  Moreover, plaintiffs alleged that Hurley "ratified the 'right' of angry students to target female classmates," without "disciplinary consequences."  *Id.*

The district court granted a motion to dismiss the suit.  *Id.* at 685.  On appeal, the Fourth Circuit concluded that plaintiffs stated an equal protection claim against Hurley, the university president, *id.* at 703, but determined that he was entitled to qualified immunity.  *Id.* at 706.  The Court also affirmed the dismissal in part of the Title IX retaliation claim, but vacated the dismissal of the Title IX sex discrimination claim and the remainder of the Title IX retaliation claim.  *Id.*

With regard to the Title IX sex discrimination claim, the Court noted that the university "was not entirely unresponsive to allegations of harassment . . . ."  *Id.* at 689.  Nevertheless, the Court stated that the university "did not engage in efforts that were 'reasonably calculated to end [the] harassment.'"  *Id.* (citation omitted).  On this basis, the Court concluded that the plaintiffs adequately alleged deliberate indifference.  *Id.* at 691.

The Court also concluded that the plaintiffs adequately alleged an equal protection claim against Hurley, "largely for the reasons set forth in [its] discussion of the Title IX sex discrimination claim."  *Id.* at 703.  In particular, the Court explained that "Hurley responded to [the] harassment [of plaintiffs by other students] with deliberate indifference, in that he had the authority to address and curtail the harassment but failed to do so over a period of months."  *Id.* In addition, the Court concluded that plaintiffs' allegations that Hurley "ratified the 'right' of angry students to target female classmates with hateful, sexist, threatening harassment, free from any disciplinary consequences", "sought to downplay the harassment and threats, and . . . made no effort to stop them," were "sufficient to state the intent element of the equal protection claim."  *Id.*

19

Nonetheless, the Court granted Hurley qualified immunity on the ground that, at the time of Hurley's alleged wrongdoing, "controlling authority did not clearly establish the right to be free from a university administrator's deliberate indifference to student-on-student sexual harassment." *Id.* at 704.

The Supreme Court has cautioned that its "conclusion . . . that [schools] may be liable for their deliberate indifference to known acts of peer sexual harassment . . . does not mean that [schools] can avoid liability only by purging their schools of actionable peer harassment or that administrators must engage in particular disciplinary action." *Davis v. Monroe Cnty Bd. of Educ.*, 526 U.S. 629, 648 (1998). Indeed, the requirement that a school's response be "clearly unreasonable in light of known circumstances" reflects the Court's judgment that "courts should refrain from second-guessing the disciplinary decisions made by school administrators." *Id.*; *see also Doe v. Bd. of Educ. of Prince George's Cnty.*, 982 F. Supp. 2d 641, 657 (D. Md. 2013) ("Reading Title IX to require federal courts to second-guess what is, at most, a debatable administrative decision would invite an avalanche of Title IX litigation and risk resultant financial harm to school districts.").

The Supreme Court's discussion of the mental state required for "deliberate indifference" in cases arising under the Eighth Amendment provides guidance, even though the deliberate indifference claim asserted here arises under the Equal Protection Clause. In *Farmer v. Brennan*, 511 U.S. 825 (1994), the Court explained that "deliberate indifference l[ies] somewhere between the poles of negligence at one end and purpose or knowledge at the other." *Id.* at 836. That is, according to the Court, "acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of *recklessly disregarding* that risk." *Id.* (emphasis added). In particular, the Court determined that a prison official may be liable for deliberate

indifference to a prisoner's needs only if there exists "a substantial risk of serious harm," *id.* at 834, and the official is "both . . . aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he . . . also draw[s] the inference." *Id.* at 837.

Thus, the deliberate indifference standard has "both an objective and a subjective component." *Moss*, 19 F.4th at 624.  The objective component requires a plaintiff to allege facts that, if proved, would establish that he was "exposed to an objectively 'substantial risk of serious harm.'" *Younger*, 79 F.4th at 382 (citation omitted).  The subjective component requires a plaintiff to allege facts that, if proved, would establish that "the defendants 'subjectively recognized' that there was such a risk," but ignored it.  *Moss*, 19 F.4th at 624 (quoting *Anderson v. Kingsley*, 877 F.3d 539, 545 (4th Cir. 2017)); *see Younger*, 79 F.4th at 382.  In other words, the mental state of "deliberate indifference" is equivalent to the mental state of recklessness as it is defined in Model Penal Code § 2.02(2)(c): "a person must 'consciously disregar[d]' a substantial risk of serious harm." *Farmer*, 511 U.S. at 839 (quoting Model Penal Code § 2.02(2)(c) (alteration in *Farmer*)).

With these principles in mind, I turn to consider whether plaintiff has adequately pleaded each of the three elements necessary to state a claim against Peake for deliberate indifference to student-on-student sexual harassment.  *See Hurley*, 911 F.3d at 702–03.

As noted, under *Hurley* "a plaintiff [asserting deliberate indifference to student-on-student sexual harassment] must first allege that she 'was subjected to discriminatory peer harassment.'" *Id.* at 702 (quoting *Stiles ex rel. D.S.*, 819 F.3d at 852).  Here, plaintiff alleges that A.T. was subjected to repeated sexual abuse by other students during the fall of 2019.  *See* ECF 21, ¶¶ 47–50.  In particular, plaintiff alleges that videos recorded on a classroom iPad "showed the other children kissing A.T. on the mouth and licking her vaginal and genital area while the incidents were being filmed." *Id.* ¶ 47.  This conduct is perhaps more accurately characterized as "abuse"

21

than "harassment." Moreover, it is not immediately evident that sexual abuse of this kind is necessarily "discriminatory." *Cf. Arbaugh v. Bd. of Educ., Cnty. of Pendleton*, 329 F. Supp. 2d 762, 772 (N.D. W. Va. 2004) (finding that plaintiff alleging sexual abuse failed to state a claim under the West Virginia Human Rights Act because "no evidence shows that [plaintiff] was sexually abused . . . *because of* his sex") (emphasis in original). Nonetheless, I need not address the question, because defendants appear to concede that plaintiff has adequately alleged discriminatory peer harassment under *Hurley*. ECF 24 at 11 ("Plaintiff fails to assert allegations that meet the proper pleading standards to support element (2) and (3).").

With respect to the second element, deliberate indifference, plaintiff asserts that Peake was designated as plaintiff's "point of contact" for any inquiries regarding the school's response to the abuse of A.T. ECF 29 at 5. And, according to plaintiff, she "attempted to contact Peake to obtain more information about what had occurred and what steps [the School] was taking to protect A.T." ECF 21, ¶ 54. But, "Peake never responded to Plaintiff's communications or requests for information pertaining to how A.T. would be kept safe at school in the future." *Id.* Plaintiff also alleges that, because of defendants' failure to respond to her concerns, she attempted to register A.T. for another school in the district. *Id.* ¶ 60. Thereafter, she received a letter from that school, indicating that she should contact Peake. *Id.* Yet, "when Plaintiff called Peake, she never received a response." *Id.* Moreover, plaintiff alleges that Peake declined "to take measures to prevent future sexual abuse of A.T.," despite knowing that A.T. was still at risk. *Id.* ¶ 93.

For their part, defendants argue that Peake's alleged failure to communicate "in the face of an ongoing DSS investigation, was at best an error of judgment and not a constitutional deprivation." ECF 24 at 11. Moreover, defendants assert that Peake did not have authority "to alter A.T.'s attendance or otherwise allow her to attend another school." *Id.*; *see also id.* at 10 n.8

(citing Md. Code (2022 Repl. Vol.), §§ 4-101, 4-109 of the Education Article ("Educ.") (LexisNexis 2023)).   Indeed, according to defendants, Peake responded to the situation appropriately when she "made the mandatory police/DSS reporting, and turned over all available evidence so an investigation could be performed by the police and DSS."  ECF 24 at 11.

In my view, plaintiff has sufficiently alleged that Peake acted with deliberate indifference to A.T.'s abuse.  In particular, plaintiff alleges that Peake learned of the abuse in December 2019 but (1) thereafter refused to communicate with A.T.'s mother about A.T.'s safety at School; (2) "declin[ed] to take measures to prevent future sexual abuse of A.T. despite knowing that it was likely to continue occurring"; (3) "fail[ed] to ensure that A.T. would be allowed to attend another school within the same school district if safely attending [the School] was not possible"; and (4) "fail[ed] to implement any respons[e] after the abuse occurred."  ECF 21, ¶¶ 91, 93.   If these allegations are proven, a factfinder could conclude that Peake's response, or lack thereof, was clearly unreasonable in light of the circumstances known to her.  *See Willey*, 557 F. Supp. 3d at 662 (finding allegation that school failed to "take a single step to ensure [a victim's] safety and wellbeing" sufficient to plead deliberate indifference).

In addition, these allegations, if established, would satisfy both the objective and subjective components of the deliberate indifference standard as defined in *Farmer* and its progeny. Specifically, plaintiff's allegations that A.T. was subjected to repeated sexual abuse in the classroom are sufficient to plead the existence of a substantial risk of serious harm.  And, plaintiff's allegation that Peake was aware of the abuse in December 2019 suffices as an allegation that Peake "subjectively recognized" the substantial risk posed to A.T.  *See Moss*, 19 F.4th at 624.

To be sure, defendants describe Peake's response after learning of A.T.'s abuse in a more favorable light.  ECF 24 at 11.  Nonetheless, in ruling on a motion to dismiss, I must accept

plaintiff's allegations as true.[13]  Moreover, to the extent that defendants ask the Court to rule as a matter of law that Peake had no authority to transfer A.T. to another school, they have provided no authority to support such a ruling.  Indeed, the sections of the Education Article cited by defendants say nothing about Peake's authority to act.  Educ. § 4-101(a) provides that "educational matters that affect the counties shall be under the control of a county board of education in each county," and Educ. § 4-109(c) provides that "the county board shall determine the geographical attendance area for each school . . . ."  The Court cannot infer from such general provisions that Peake was unable to arrange for A.T. to attend a different school.

In sum, I am satisfied that plaintiff's allegations of inaction by Peake suffice to plead the second element of an equal protection claim under *Hurley*.

With respect to the third element of a deliberate indifference claim, *i.e.*, discriminatory intent, plaintiff argues that she "is informed and believes that Peake's deliberate indifference was motivated by discriminatory intent spurred by A.T.'s gender and status as a female student who had suffered sexual abuse at the hands of other female students." ECF 21, ¶ 94.  She relies primarily on Peake's repeated inaction as support for her assertion that Peake acted with discriminatory intent. *See* ECF 29 at 13.

According to plaintiff, after the School discovered the videos, it scheduled a meeting on December 4, 2019, at which "Peake informed Plaintiff that A.T. 'made a bad decision and decided to take the school iPad into the restroom and take nude photos of herself.'" ECF 21, ¶ 42. The fact that A.T. had been victimized was not yet known.  *See id.* ("A.T. later indicated to Plaintiff that Student A had instructed her to take the photographs.").   After the school "found A.T.'s

---

[13] Of course, defendants will have the opportunity to substantiate their competing view of the relevant facts when the record is further developed.

photographs in the deleted folder on the classroom iPad, all 200 of the school iPads were examined," and the abuse was discovered from review of the devices. *Id.* ¶ 46. As noted, plaintiff maintains that Peake then ignored her repeated requests for assistance. *Id.* ¶¶ 54, 60.

In response, defendants contend that plaintiff "has failed to assert that she was been [sic] treated differently from similarly situated students or even any of the students involved in the various incidents," or "that . . . Peake was acting with discriminatory intent or purpose." ECF 24 at 11. In particular, defendants assert that plaintiff has not alleged that Peake "selected . . . a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.* at 12 (quoting *Borkowski v. Balt. Cnty., Maryland*, 414 F. Supp. 3d 788, 808 (D. Md. 2019)).

Defendants are correct that, as a general matter, a plaintiff asserting an equal protection violation must allege "that the decisionmaker . . . selected . . . a particular course of action at least in part 'because of,' not merely in spite of,' its adverse effects upon an identifiable group.'" *Hernandez v. New York*, 500 U.S. 352, 360 (1991) (quoting *Feeney*, 442 U.S. at 279). Nonetheless, *Hurley*, 911 F.3d 674, and several cases applying it, suggest that for a claim based on deliberate indifference, allegations of inaction in the face of sexual harassment or abuse are sufficient to plead discriminatory intent.

In *Hurley*, 911 F.3d at 703, the Fourth Circuit concluded that the plaintiffs' allegations that the defendant "sought to downplay the harassment and threats, and . . . made no effort to stop them," were "sufficient to state the intent element . . . ." Citing *Hurley*, the court in *Danvers as next friends of Danvers v. Loudoun Cty. Sch. Bd.*, RDA-21-1028, 2022 WL 4585524 (E.D. Va Sep. 29, 2022), concluded that the plaintiff's allegations "that both [defendants] were apathetic and dismissive when confronted by the [plaintiff's] complaints" of sexual harassment were

sufficient to plead discriminatory intent. *Id.* at *14. Similarly, in *M.B. v. Chapel Hill-Carrboro City Schs. Bd. of Educ.*, LCB-20-796, 2021 WL 4412406, (M.D.N.C. Sep. 27, 2021), the court concluded that allegations that the defendants "were either openly skeptical of, or inclined to minimize, Plaintiff's disclosure and did little to stop the alleged harassment [provided] . . . a sufficient basis from which to infer discriminatory intent." *Id.* at *5.

Following *Hurley*, *Danvers*, and *M.B.*, I am satisfied that it is appropriate to infer discriminatory intent from Peake's alleged inaction in the face of A.T.'s abuse. The *Feeney* standard cited by defendants does not preclude such an inference. Indeed, it is well established that a plaintiff can establish discriminatory intent through an inference based on circumstantial evidence. *See Vill. of Arlington Heights v. Met. Housing Dev. Corp.*, 429 U.S. 252, 266 (1977) ("Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."). Under *Hurley*, inaction in the face of sexual abuse is circumstantial evidence that may support an inference of discriminatory intent.

In sum, the allegations concerning Peake's conduct in response to the sexual abuse of A.T., and plaintiff's repeated efforts to address the matter with her, are sufficient to state an equal protection claim.

### 2. Substantive Due Process

Defendants contend that plaintiff has not stated a viable claim for a substantive due process violation. ECF 24 at 13 n.9. Further, defendants argue that there is "no basis in the law to support a substantive due process claim against Ms. Peake in her individual capacity for acts involving third parties for which she had no notice and was not personally involved." *Id.* at 14–15.

26

The Fourteenth Amendment includes a "substantive due process right against state actor conduct that deprives an individual of bodily integrity." *Doe v. Rosa*, 795 F.3d 429, 436–37 (4th Cir. 2015). As a rule, state actor liability is limited and generally does not attach in instances of private conduct, such as student-on-student attacks. *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989) (the Due Process Clause "cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means"). Nonetheless, the Supreme Court has recognized at least two exceptions to this general rule: the special relationship doctrine and the state-created danger doctrine. *Id*. at 195–96, 199–200.

### (a) Special Relationship

The first exception to the general rule of non-liability of a state actor for private conduct is the special relationship doctrine.  It applies when the state and the aggrieved individual have a special relationship by which the state has an affirmative duty to protect the individual from harm inflicted by a third party. *DeShaney*, 489 U.S. at 200–01; *see also Waybright v. Frederick Cty., MD*, 528 F.3d 199, 207 (4th Cir. 2008) ("As *DeShaney* indicates and our case law specifies, a 'special relationship' is all but synonymous with a custodial relationship.").

In *DeShaney*, 489 U.S. at 200, the Supreme Court explained that the special relationship exception applies in custodial situations, "when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself."  Typically, such restraint occurs by way of "some sort of confinement . . . such as incarceration, institutionalization, or the like." *Waybright*, 528 F.3d at 207 (4th Cir. 2008) (citing *Pinder v. Johnson*, 54 F.3d 1169, 1175 (4th Cir. 1995)).

The case of *Stevenson ex rel. Stevenson v. Martin Cty. Bd. of Educ.*, 3 F. App'x 25 (4th Cir. 2001) (per curiam), although unpublished, provides guidance. In that case, during a two-month period, a ten-year-old sixth-grade student was beaten and bullied by two classmates on a regular basis. *Id.* at 27. In particular, the student was bludgeoned in the head while in art class, and when the student asked his teacher for help, she allegedly responded by stating "'[t]here isn't anything I can do'" and that the student "'deserved it anyway.'" *Id.* at 28. The school principal failed to report the physical assault to the juvenile authorities, and the student's father eventually submitted a juvenile petition. *Id.* All the while, the beatings continued. Then, the bullies harassed the student and his father at a music festival, at which point the father chose to enroll the student in a private school. *Id.*

The student filed, *inter alia,* a § 1983 claim against the board of education and several school officials, alleging that the "defendants violated his liberty interest in bodily integrity." *Id.* at 30.  Of relevance here, the Fourth Circuit concluded that a relationship between a school and a student is not a "special relationship" that gives rise to due process protections requiring the defendants to protect the student from harm inflicted by a third party.  *Id.* at 31. The Court said, *id.*: "Following the lead of our sister circuits, we hold that the Martin County School officials did not have a 'special relationship' with [the student] that triggered the protections of the Due Process Clause in this case."  The Court reasoned, *id.*: "When a student attends public school, her liberty is not restrained to the extent contemplated in *DeShaney*.  Attending school is not the equivalent of incarceration or institutionalization . . . the state, simply by virtue of its maintenance of a public school system, does not become constitutionally liable for failing to prevent all student-on-student violence."

In her Opposition, plaintiff acknowledges that the Fourth Circuit has found, generally, that the relationship between a school and a student is not "special" and therefore does not give rise to due process protections.  *See* ECF 29 at 15 n.4 (citing *Stevenson ex rel. Stevenson,* 3 F. App'x at 31).

Therefore, Peake did not have a "special relationship" with A.T. that would give rise to due process protections. *See*, *e.g., O.W. by next friend Bass v. Sch. Bd. of City of Virginia Beach,* ___ F. Supp. 3d ___, 2023 WL 1994355, at *14 (E.D. Va. 2023); *Doe # 1 v. Montgomery Cnty. Bd. of Educ.*, PJM-21-0356, 2021 WL 6072813, at *10 (D. Md. Dec. 23, 2021). Accordingly, to the extent that plaintiff attempts to hold Peake liable for a due process violation under the special relationship doctrine, she has failed to state a claim in Count II.[14]  *See McClure v. Charlotte-Mecklenburg Bd. of Educ*., KDB-20-5, 2021 WL 7448762, at *4 (W.D.N.C. Mar. 18, 2021) (stating that "the state is not constitutionally liable for preventing student-on-student violence just because it operates the school at which the violence takes place."); *B.M.H. v. Sch. Bd. of City of Chesapeake*, 833 F. Supp. 560, 571 (E.D. Va. 1993) ("Even if public schools have some duty under state law to protect students, that is not enough to place the affirmative burdens of the Fourteenth Amendment Due Process Clause upon teachers, principals, and administrators to protect each child from possible harm by third parties.").

---

[14] In *Doe v. Board of Educ. of Prince George's Cnty*., 888 F. Supp. 2d 659 (D. Md. 2012), the plaintiffs alleged that the defendant school board was liable under Title IX and state tort law for failing to protect their son from sexual harassment committed by a classmate. *Id.* at 661–63. Citing *DeShaney*, the defendants argued, among other things, that the school had no duty under the law of negligence to protect the plaintiffs' son from abuse by a third party. *Id.* at 669.  The court disagreed, observing that "the standard for proving a negligence claim under state tort law is lower than the standard for proving that the state's failure to protect someone from private violence violates the Due Process Clause." *Id.* at 669 (citing *DeShaney*, 489 U.S. at 201–02).

### (b) State-Created Danger Liability

The second exception to non-liability of a state actor for private conduct is the state-created danger doctrine.  In her Opposition, plaintiff argues that the state-created danger doctrine provides a basis for the liability of Peake. ECF 29 at 14-17; *see also* ECF 34 at 4.

Defendants insist that plaintiff's claim must fail, because Peake's alleged conduct "did not lead to further assaults."  ECF 34 at 5 (emphasis in original).  Moreover, they claim that Peake's conduct did not amount to "affirmative action" that increased A.T.'s danger, as is required for liability under the state-created danger doctrine. *Id.*

"[T]o establish § 1983 liability under the state-created danger doctrine, a plaintiff must show that the state actor created or increased the risk of private danger, and did so directly through affirmative acts, not merely through inaction or omission." *Rosa*, 795 F.3d at 439; *see DeShaney*, 489 U.S. at 201 ("While the State may have been aware of the dangers that [the child] faced . . . it played no part in their creation, nor did it do anything to render him any more vulnerable to them."); *Paige v. Herring*, 2022 WL 337131, at *2 (4th Cir. Feb. 4, 2022) (per curiam) (same); *Callahan v. N.C. Dep't of Pub. Safety,* 18 F.4th 142, 146 (4th Cir. 2021) (same); *Graves v. Lioi*, 930 F.3d 307, 319 (4th Cir. 2019) (recognizing that the state-created danger exception "applies only when the state affirmatively acts to create or increase the risk that resulted in the victim's injury").

The state-created danger exception is narrow; "the bar for what constitutes an affirmative act is high." *Turner v. Thomas*, 930 F.3d 640, 645 (4th Cir. 2019).  And, as the Fourth Circuit said in *Pinder*, 54 F.3d at 1175: "It cannot be that the state commits an affirmative act or creates a danger every time it does anything that makes injury at the hands of a third party more likely." *See also Graves*, 930 F.3d at 319–20.

30

Further, "[t]he concept of affirmative acts should not extend beyond the context of immediate interactions between the [state actor] and the plaintiff. A downstream, but-for connection between the state's conduct and the alleged harm stretches the affirmative acts concept too far to support a state-created danger claim." *Callahan*, 18 F.4th at 147 (internal quotation marks and citations omitted) (brackets in *Callahan*). But, "[i]t is not enough to reframe a failure to protect against a danger into an affirmative act." *Id.* at 148.

The context in which the alleged constitutional injury occurs is important to the analysis. The Supreme Court has recognized that, in an educational setting, a school may exercise substantial control over a harasser. *See Davis*, 526 U.S. at 646. Although a school setting by itself does not give rise to a constitutional duty to protect or a special relationship, the specific factual circumstances of a claim arising in a school setting may be pertinent in determining whether a claim under the state-created danger doctrine will survive a motion to dismiss. *See D.J. by & through Hughes v. Sch. Bd. of Henrico Cty.*, 488 F. Supp. 3d 307, 325–26 (E.D. Va. 2020) (citing *Rosa*, 795 F.3d at 439).

Plaintiff cites *Doe # 1*, 2021 WL 6072813, for support. In that case, the school principal allegedly failed, among other things, to "assure appropriate oversight" or to discipline a "known troublemaker." *Id.* at *11. The plaintiff also alleged that the principal "tried to cover up" prior assaults and "eliminat[ed] a previously required study hall for bullies." *Id.* A claim based on the state-created danger theory of liability survived a motion to dismiss.

Recognizing the uncertain boundary between inaction and liability under the state-created danger doctrine, Judge Messitte stated, *id.*:

> One can debate philosophically whether actions such as those present here are mere failures to act as opposed to "affirmative" acts. But, in marked contrast to neutral failure-to-act cases, where a defendant does nothing at all after notice of an assault, the allegations in the present case, certainly as to Defendant Crouse, involve steps,

purposefully taken, that arguably enhanced the dangerous situations that resulted in the injuries to the Minor-Plaintiffs.

The recent case of *Burns-Fisher v. Romero-Lehrer*, 57 F.4th 421, 426 (4th Cir. 2023), is informative. There, a teacher sued the board of education, its superintendent, and the principal after she was attacked by a special education student. *Id.* at 426. The teacher alleged, *inter alia*, a violation of her constitutional liberty interest in bodily integrity based on a state-created danger theory. *Id.* at 424. The Fourth Circuit held that the claim was deficient because it rested on "alleged choices and inactions" by the Superintendent that were "far removed" from the student's attack. *Id.* at 425. The Court noted that the plaintiff "fail[ed] to point to any action by Appellant which created the danger that resulted in [the] injuries." *Id.*

The facts of *Willey*, 557 F. Supp. 3d 645, are also instructive. There, a female high school student, Jaelynn Willey, was shot and killed in school by a male student, Austin Rollins. Her parents brought suit against a host of defendants, alleging multiple claims. Among other claims, the plaintiffs asserted an equal protection claim against Deputy Sheriff Blaine Gaskill, who failed to screen students as they entered school on the day in question, despite a threat of violence the day before the shooting. *Id.* at 665.

In a comprehensive opinion, Judge Grimm dismissed a state-created danger claim against the deputy sheriff. He explained: "A second exception to the general rule [against State actor liability for private conduct] occurs when the state itself creates the danger." *Id.* at 666. He added: "To create such a danger, the state must take some affirmative action that gives rise to liability. Standing by and doing nothing in the face of danger . . . does not implicate the state in the harm caused by third-parties —a more active role is required." *Id.* (internal citations omitted). Judge Grimm concluded, *id.*: "Plaintiffs have not alleged that Deputy Gaskill took affirmative action to

create the danger. Just the opposite, they allege that he did nothing and failed to protect Jaelynn from Rollins."

Here, Peake's alleged liability under the state-created danger doctrine is premised on the allegation that "Peake knowingly declined to interact with Plaintiff and failed to take requisite steps to provide a safe educational environment" for A.T. ECF 29 at 16. Further, plaintiff claims that Peake "declined to address the sexual harassment and played a part in preventing A.T. from attending school elsewhere thereby forcing A.T. to choose" her "personal safety" rather than an education. *Id.* at 15; *see also* ECF 21, ¶ 93. Although defendants dispute the facts, it is not the role of the Court in ruling on a motion to dismiss to resolve factual disputes.

In my view, plaintiff's allegations do not pass muster. Plaintiff premises her state-created danger claim on Peake's alleged failure to communicate; her failure to assist in relocating A.T. to a new school; and her failure to establish safety measures for A.T. She asserts that Peake took no action to protect A.T. Indeed, she complains that Peake was repeatedly non-responsive.

To the extent that plaintiff seeks to characterize plaintiff's omissions as "actions," ECF 21, ¶¶ 95, 96, the Court must "resist the temptation to accept plaintiff['s] attempts to artfully recharacterize inaction as action." *Burns-Fisher*, 57 F. 4th at 423 (quoting *Graves*, 930 F.3d 307 at 327). "Inactions or omissions by the state actor will not suffice" to support liability under the state-created danger doctrine. *Paige*, 2022 WL 337131, at *2. Even if these facts are proven, they would not show that Peake either created or increased the risk of danger to A.T. Accordingly, the facts alleged by Peake do not support a claim for § 1983 liability under the state-created danger doctrine.

### C. Count III (Defendant Michael)

Count III asserts a § 1983 claim against Michael, in his individual capacity, for supervisory liability. ECF 21, ¶¶ 99–114. In particular, plaintiff asserts that the letter she sent to the Board, on an unspecified date, provided Michael with notice that no responsive measures had been taken to assure A.T.'s safety.  *Id.* ¶ 103.  According to plaintiff, Michael "declined to act when he knew that members of the Board and Peake refused" to communicate with plaintiff or "to take any steps to provide A.T. with a reasonably safe school environment for the future . . . ."  *Id.* ¶ 106. Therefore, plaintiff claims that "Michael knew and acquiesced to Peake's and the Board members' actions," *id.* ¶ 107, and failed to supervise and control them.  *Id.* ¶¶ 110, 113.  Further, plaintiff alleges that, through his inaction, Michael allowed A.T. "to languish in a sort of educational purgatory where she was stuck between attending a school where she faced additional potential sexual abuse or abstaining" from attending school at all.  ECF 29 at 18; *see* ECF 21, ¶¶ 106, 108.

Defendants respond that Count III fails as a matter of law because plaintiff did not plead all elements necessary to state a claim of supervisory liability under 42 U.S.C. § 1983. ECF 24 at 15–18.  Further, they argue that plaintiff misunderstands "the role and powers of a school superintendent" under Maryland law, and therefore attributes to Michael supervisory responsibility that he did not actually have.  *Id.* at 15.

"[S]upervisory liability is a well-established concept in our § 1983 jurisprudence[.]" *Younger*, 79 F.4th at 381 n.12; *see, e.g.*, *Wilkins v. Montgomery*, 751 F.3d 214, 226–28 (4th Cir. 2014).  But, the doctrine of respondeat superior does not apply in § 1983 claims. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004).   Therefore, "[b]ecause vicarious liability is inapplicable" in a § 1983 suit, a plaintiff must plead that each defendant, based on his or her own actions, violated the Constitution.  *Iqbal*, 556 U.S. at 676.  In other words, in a § 1983 case, a

defendant "is only liable for his or her own misconduct." *Id.* at 677; *see Younger*, 79 F.4th at 381 n.12.

However, "[a] supervisor can . . . be held liable for the failings of a subordinate under certain narrow circumstances." *Green v. Beck*, 539 F. App'x 78, 80 (4th Cir. 2013).   This supervisory liability "is not based on ordinary principles of *respondeat superior*, but rather . . . on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)).

As indicated, to state a claim for supervisory liability, a plaintiff must plead that the government-official defendant, through the official's own individual actions, violated the Constitution. *See Iqbal*, 556 U.S. at 676. In particular, a plaintiff must allege facts, that, if proven, show (1) that "the supervisor had actual or constructive knowledge that h[er] subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff . . . (2) that the supervisor's response to that knowledge was so inadequate . . . as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices' . . . and (3) that there was 'an affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." *Wilkins*, 751 F.3d at 226 (quoting *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994)) (alteration in *Wilkins*).[15]

The first element requires a plaintiff to allege facts that would show that "the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged

---

[15] In *Younger*, the Court stated that it need not decide "whether or how much of the three-factor test from *Shaw* conflicts with *Iqbal* . . . ." 79 F.4th at 384 n.16.

in by the subordinate poses an unreasonable risk of harm of constitutional injury." *Wilkins,* 751 F.3d at 226.

The second element requires a plaintiff to allege deliberate indifference or tacit authorization on a defendant's part, such as "a supervisor's continued inaction in the face of documented widespread abuses." *Id.; see also Collins v. Clarke*, EKD-22-00406, 2023 WL 4109773, at *5 (W.D. Va. June 21, 2023). A "plaintiff assumes a heavy burden of proof on this point because, ordinarily, he cannot satisfy it 'by pointing to a single incident or isolated incidents . . . .'" *Timpson*, 31 F.4th at 258 (quoting *Slakan*, 737 F.2d at 373).

The third element of supervisory liability encompasses the usual tort principle of proximate cause. This requires a plaintiff to allege facts that, if proven, would show that it is more likely than not that the supervisor's conduct caused the injury. *Shaw*, 13 F.3d at 799.

The gravamen of plaintiff's claim against Michael is that he failed to take appropriate remedial action after learning of A.T.'s abuse and thereby prevented A.T. from returning to School. *See* ECF 21, ¶¶ 99–114. In particular, plaintiff alleges that, on an unspecified date, she wrote to the Board inquiring about the investigation of A.T.'s abuse. *Id.* ¶ 62. And, plaintiff asserts that "Michael knew of [her] letter to the Board of Education because the Board of Education provided an official response to the letter in January 2020." *Id.* ¶ 103. Nonetheless, according to plaintiff, "Michael declined to act when he knew that members of the Board and Peake refused to have any communication with Plaintiff, refused to take any steps to provide A.T. with a reasonably safe school environment for the future, [and] denied A.T. access to another public school within the same school district . . . ." *Id.* ¶ 106. Further, plaintiff claims that "Michael's failure to supervise and control Peake, and members of the Board of Education subjected A.T. to the deprivation of

her federally protected rights and was so inadequate as to show Michael's own indifference to and/or tacit authorization of the Board's and Peake's actions." *Id.* ¶ 108.

In response, defendant argues, first, that, under Educ. § 4-205, Michael's status as superintendent did not confer upon him any supervisory authority over the Board of Education. ECF 24 at 6–8, 15. Therefore, according to defendants, plaintiff's claim must be dismissed to the extent that it rests on Michael's alleged failure to supervise the Board. *Id.* at 8.

Defendant argues, second, that plaintiff failed to allege that Michael "had actual or constructive knowledge that any subordinate was engaged in conduct that posed a pervasive and unreasonable risk of unconstitutional injury to the plaintiff; (2) that [his] acts or omissions rose to the level of deliberate indifference; or that (3) there was any link between [his] alleged inaction and any of the asserted constitutional depravations [sic]." *Id.* at 18.

I begin by addressing defendants' argument that Michael did not have supervisory authority over the Board and plaintiff's competing contention that the superintendent controls the Board.

The Board consists of seven members who are elected "from Washington County at large." Educ. § 3-1301(b). The Board appoints the county superintendent and determines his "job description and duties." *See* Policies of the Washington County Board of Education ("Board Policies") § CBC(1)[16]; *id.* § CBC(2) ("The authority to select, employ and to fill a vacancy of the Superintendent of Schools is vested in the Board of Education of Washington County . . . ."); *see also* Educ. § 4-201(b)(3). Notably, under the Board Policies, the superintendent is "responsible directly to the Board . . . and subject to its authority . . . ." Board Policies § CBC(4). Although

---

[16] The Court may take judicial notice of these policies because they are "matters of public record." *Goldfarb*, 791 F.3d at 508 (citation and internal quotation marks omitted).

the superintendent "may advise on any question under consideration" by the Board, he "may not vote." Educ. § 4-102(c). These provisions provide no basis for concluding that Michael had supervisory authority over the Board. Indeed, they tend to show that the Board had supervisory authority over Michael.

To be sure, Maryland law provides that a county superintendent acts "[a]s the executive officer of the county board." *See* Educ. § 4-204(b). But, as "executive officer of the board," the county superintendent's duty is to "see that," *inter alia*, "the policies of the county board" "are carried out." *Id.* The duty to execute the policies of the Board does not amount to supervisory control over the Board. In sum, plaintiff does not cite to, nor I have identified, any provision of law to support the assertion that Michael was authorized "to supervise, control and direct . . . members of the Board of Education." ECF 21, ¶ 110; *see* Educ. § 4-205 (enumerating additional powers and duties of county superintendent).

Plaintiff also asserts that Michael acted with deliberate indifference to A.T.'s "clearly established Constitutional rights" by acquiescing in Peake's alleged failure to respond appropriately to the revelations of A.T.'s abuse. *Id.* ¶ 113. To be sure, I have concluded that plaintiff stated a claim against Peake under the Equal Protection Clause. It does not follow, however, that Michael's purported failure to intervene in Peake's allegedly unconstitutional conduct is, *ipse facto*, a constitutional tort on his part. *See Iqbal*, 556 U.S. at 676 ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*.") (italics in original). Instead, it is plaintiff's burden to allege facts that, if proved, would establish that Michael took no action despite knowledge that his "subordinate [*i.e.*, Peake] was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff," or, alternatively formulated, that Michael demonstrated

"continued inaction in the face of documented widespread abuses." *Wilkins*, 751 F.3d at 226 (quotation marks omitted); *see also King*, 76 F.4th at 269 ("[A] supervisor's 'mere knowledge' that his subordinates are engaged in unconstitutional conduct is not enough.").

Michael's alleged failure to take remedial action after learning that plaintiff inquired with the Board about the status of the investigation does not amount to deliberate indifference. Even if plaintiff's inquiry to the Board made Michael aware of the abuse of A.T., and Peake's allegedly deficient response, it did not put Michael on notice of "documented widespread abuses" committed by Peake. *See Wilkins*, 751 F.3d at 226 (quotation marks omitted). Nor do the allegations suggest that Michael was aware that Peake "engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff." *See id.* At most, Peake's alleged unconstitutional response to A.T.'s abuse was a "single incident"—far from the kind of repeated wrongdoing by a subordinate that a supervisor who knows of it might be liable for failing to correct. *Timpson*, 31 F.4th at 258.

For these reasons, I conclude that plaintiff has failed to state a claim against Michael based on supervisory liability.

### D. Qualified Immunity

Peake asserts that she is entitled to qualified immunity with respect to the § 1983 equal protection claim. ECF 24 at 18.[17] According to Peake, plaintiff does not allege that Peake is liable for the failure to "prevent" the sexual abuse of A.T. *Id.* at 19. Instead, Peake claims, plaintiff alleges a constitutional violation based on the way that Peake "reacted" to the abuse. *Id.* And,

---

[17] Michael also asserts he is entitled to qualified immunity for the supervisory liability claims. Given the outcome of the Motion as to Count III, I do not reach this argument. For the same reasons, I do not reach the qualified immunity argument with respect to plaintiff's claim against Peake for the alleged violation of A.T.'s substantive due process right to bodily integrity.

Peake argues that she is entitled to qualified immunity with respect to her "reaction" to the abuse because it was not until the Fourth Circuit decided *Doe*, 1 F.4th 257, that she was on notice of her *post hoc* remedial obligations.  ECF 24 at 19–20; *see Doe*, 1 F.4th at 274 (holding "that a school [official] may be held liable under Title IX based on a single, pre-notice incident of severe sexual harassment, where the school's deliberate indifference to that incident made the plaintiff more vulnerable to future harassment, or otherwise had 'the combined systemic effect of denying [equal] access to a scholastic program or activity'") (quoting *Fitzgerald v. Barnstable Sch. Comm.*, 504 F.3d 165, 172 (1st Cir. 2007)).

In response, plaintiff contends that Peake is not entitled to qualified immunity because, at the time of the abuse and even before *Doe*, Peake "had reasonable notice that conduct that is deliberately indifferent to student-on-student sexual harassment would violate A.T.'s constitutional rights."  ECF 29 at 20.  In particular, plaintiff observes that, more than a year before the occurrences at issue, the Fourth Circuit ruled in *Hurley*, 911 F.3d 674, that "a victim of student-on-student sexual harassment can pursue an equal protection claim predicated on a school administrator's deliberate indifference to such harassment."  *Id.* at 702.

"Qualified immunity bars § 1983 actions against government officials in their individual capacities 'unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time.'" *Barrett v. PAE Government Servs., Inc.*, 975 F.3d 416, 428 (4th Cir. 2020) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018)) (cleaned up); *see Rivas-Villegas v. Cortesluna*, 595 U.S. ___, 142 S. Ct. 4 (2021) (per curiam); *City of Tahlequah Okla. v. Bond*, 595 U.S. 9 (2021) (per curiam); *Taylor v. Riojas*, 598 U.S. ___, 141 S. Ct. 52, 53 (2020); *Hulbert v. Pope*, 70 F. 4th 726, 732 (4th Cir. 2023); *Franklin v. City of Charlotte*, 64 F.4th 419, 530, 534–35 (4th Cir. 2023); *Hicks v. Ferreyra*, 64

F.4th 156, 169 (4th Cir. 2023); *Davison v. Rose*, 19 F.4th 626, 640 (4th Cir. 2021); *Halcomb v. Ravenell*, 992 F.3d 316, 319 (4th Cir. 2021); *Humbert v. Mayor and City Council of Balt.*, 866 F.3d 546, 555 (4th Cir. 2017), *cert. denied*, ___ U.S. ___, 138 S. Ct. 2602 (2018); *Osborne v. Georgiades*, 679 F. App'x 234, 237 (4th Cir. 2017); *Scinto v. Stansberry*, 841 F.3d 219, 235 (4th Cir. 2016); *Hunter v. Town of Mocksville*, 789 F.3d 389, 401 (4th Cir. 2015).

The Fourth Circuit recently reiterated: "'Qualified immunity shields government officials performing discretionary functions from personal-capacity liability for civil damages under § 1983, insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Garrett v. Clarke*, 74 F.4th 579, 583 (4th Cir. 2023) (quoting *Davison*, 19 F.4th at 640); *see also King*, 76 F.4th at 264–65; *Owens*, 767 F.3d at 395.

Qualified immunity turns on the "objective reasonableness of an official's conduct, as measured by reference to clearly established law." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). An official who makes an honest but objectively unreasonable mistake is not protected by qualified immunity. Rather, the doctrine protects officials "'who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful.'" *Williams v. Ozmint*, 716 F.3d 801, 805 (4th Cir. 2013) (citation omitted); *accord Durham v. Horner*, 690 F.3d 183, 188 (4th Cir. 2012).

The doctrine of qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *see Hicks*, 64 F.4th at 169; *Barrett*, 975 F.3d at 428–29; *Betton v. Belue*, 942 F.3d 184, 190 (4th Cir. 2019); *Wilson v. Prince George's Cnty.*, 893 F.3d 213,

219 (4th Cir. 2018); *Smith v. Ray*, 781 F.3d 95, 100 (4th Cir. 2015). Countless cases support these principles. *See, e.g., Reichle v. Howards*, 566 U.S. 658, 664 (2012); *Saucier v. Katz*, 533 U.S. 194, 206 (2001); *Robertson v. Anderson Mill Elem. School*, 989 F.3d 282, 288 (4th Cir. 2021); *Ray v. Roane*, 948 F.3d 222, 229–30 (4th Cir. 2020); *Hupp v. Cook*, 931 F.3d 307, 317 (4th Cir. 2019); *Attkisson v. Holder*, 925 F.3d 606, 623 (4th Cir. 2019); *Williamson v. Stirling*, 912 F.3d 154, 186 (4th Cir. 2018); *Sims v. Labowitz*, 885 F.3d 254, 260 (4th Cir. 2018); *Spivey v. Norris*, 731 F. App'x 171, 175 (4th Cir. 2018); *O'Neal v. Rollyson*, 729 F. App'x 254, 255 (4th Cir. 2018) (per curiam); *Crouse v. Town of Moncks Corner*, 848 F.3d 576, 582–83 (4th Cir. 2017); *Occupy Columbia v. Haley*, 738 F.3d 107, 118 (4th Cir. 2013); *Bland v. Roberts*, 730 F.3d 368, 391 (4th Cir. 2013); *Merchant v. Bauer*, 677 F.3d 656, 661 (4th Cir. 2012), *cert. denied*, 568 U.S. 1068 (2012).

Qualified immunity is an affirmative defense. *Hicks*, 64 F.4th at 169; *Ridpath v. Bd. of Governors Marshall Univ.,* 447 F.3d 292, 305 (4th Cir. 2006). But, it does not merely provide a defense to liability. Rather, it provides "*immunity from* suit . . . ." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis in *Mitchell*); *see Gilliam v. Sealey*, 932 F.3d 216, 229 (4th Cir. 2019), *cert. denied,* ___U.S.___, 140 S.Ct. 2641 (2020)*; see also Ussery v. Mansfield*, 786 F.3d 332, 337 (4th Cir. 2015). Accordingly, the immunity is "'effectively lost if a case is erroneously permitted to go to trial.'" *Id.* (quoting *Mitchell*, 472 U.S. at 526).

To determine whether qualified immunity applies, courts generally conduct a two-step inquiry.  *King,* 76 F.4th at 265; *Hicks*, 64 F.4th at 169.  First, courts ask whether the facts alleged, "[t]aken in the light most favorable to the party asserting the injury, . . . show the [official's] conduct violated a constitutional [or statutory] right." *Saucier*, 533 U.S. at 201.  Second, courts ask whether the right at issue "'was clearly established in the specific context of the case—that is,

[whether] it was clear to a reasonable [official] that the conduct in which he allegedly engaged was unlawful in the situation he confronted.'" *Merchant*, 677 F.3d at 662 (quoting *Figg v. Schroeder*, 312 F.3d 625, 635 (4th Cir. 2002)); *see also Cannon v. Village of Bald Head Island*, 891 F.3d 489, 497 (4th Cir. 2018); *Scinto*, 841 F.3d at 235. "'Courts are no longer required to analyze these questions sequentially, but it is often the better approach' to 'determine first whether the plaintiff has alleged a deprivation of a constitutional right at all.'" *E.W. ex rel. T.W. v. Dolgos*, 884 F.3d 172, 178 (4th Cir. 2018) (internal citation omitted).[18]

"The plaintiff bears the burden of proof on the first question—i.e., whether a constitutional violation occurred . . . . [and] [t]he defendant bears the burden of proof on the second question— *i.e.*, entitlement to qualified immunity." *Henry v. Purnell*, 501 F.3d 374, 377–78 (4th Cir. 2007) (internal citations omitted); *see also Stanton v. Elliott*, 25 F.4th 227, 233 (4th Cir. 2022).

As indicated, if an official is shown to have violated the rights of a plaintiff, the court must "evaluate whether the right at issue was 'clearly established' at the time of the [official's] conduct." *Wilson*, 893 F.3d at 219. This is a question of law for the court to resolve. *Ray*, 948 F.3d at 228; *Pritchett v. Alford*, 973 F.2d 307, 312 (4th Cir. 1992).

"The inquiry into whether a constitutional right is 'clearly established' requires defining the right at issue." *Hicks*, 64 F.4th at 170; *see Pfaller*, 55 F.4th at 445; *Halcomb*, 992 F.3d at 319–20. "The Supreme Court has cautioned against defining a right with 'a high level of generality'. . . ." *Hicks*, 64 F.4th at 170 (citing *Kisela v. Hughes*, 584 U.S. ___, 138 S.Ct. 1148, 1152 (2018)); *see City of Escondido v. Emmons*, 586 U.S. ___, 139 S.Ct. 500, 503 (2019); *White*

---

[18] The Fourth Circuit has "effectively done away with the clearly established prong of qualified immunity for a subset of deliberate indifference cases," *Younger*, 79 F.4th at 385 n.17, namely, cases in which the alleged "Eighth Amendment violation[] inherently include[s] knowing disregard for the law." *Pfaller v. Amonette*, 55 F.4th 436, 445–48 (4th Cir. 2022); *see Thorpe v. Clarke*, 37 F.4th 926 (4th Cir. 2022).

*v. Pauly*, 580 U.S. 73, 79 (2017); *Younger*, 79 F.4th at 385.  Instead, the court must "define the right at issue with specificity." *Knibbs v. Momphard*, 30 F.4th 200, 223 (4th Cir. 2022).[19]

"'Clearly established' means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand what he is doing is unlawful." *Wesby*, 583 U.S. at 63 (internal quotation marks omitted); *see King*, 76 F.4th at 265.  Put another way, the "clearly established" standard "requires that the contours of the legal rule be 'so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Garrett*, 74 F.4th at 584 (quoting *City of Tahlequah*, 595 U.S. at 12 (internal quotation marks omitted)). In other words, "existing precedent must have placed the statutory or constitutional question beyond debate." *Tarashuk v. Givens*, 53 F.4th 154, 162 (4th Cir. 2022) (integral quotation and citation omitted); *see King*, 76 F.4th at 265–66.

In assessing qualified immunity, a court in Maryland is guided by cases from the Supreme Court, the Fourth Circuit, and "the highest court of the state in which the action arose." *Thompson v. Virginia*, 878 F.3d 89, 98 (4th Cir. 2017). In the absence of controlling authority, the court considers "whether the right was clearly established based on general constitutional principles or a consensus of persuasive authority." *Id*. (internal quotation marks omitted). And, "even when the facts in the record establish that the [official's] conduct violated a plaintiff's constitutional rights, the [official] still is entitled to immunity from suit 'if a reasonable person in the [official's] position

_____

[19] Defining the right at issue is not necessarily an easy task.  In *Younger*, 79 F.4th 373, the Fourth Circuit stated that the district court "failed to heed [the] requirement" of specificity.  *Id*. at 386 n.20.  In that case, which involved the brutal beating of a prisoner by correctional officers, the district court defined the right at issue as a "prisoner's 'right to be protected from malicious attack . . . from the very officials tasked with ensuring their security.'" *Id*.  According to the Fourth Circuit, the district court's definition was too general.  *Id*.

could have failed to appreciate that his conduct would violate those rights.'" *Wilson*, 893 F.3d at 219 (quoting *Torchinsky v. Siwinski*, 942 F.2d 257, 261 (4th Cir. 1991)); *see also Williams v. Strickland*, 917 F.3d 763, 768 (4th Cir. 2019); *Greene v. Feaster*, 733 F. App'x 80, 82 (4th Cir. 2018) (per curiam) ("Even when a prison official [is shown to have violated a constitutional right of a plaintiff], qualified immunity will shield him from liability as long as his 'conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'") (quoting *Goines*, 822 F.3d at 170).

However, "[t]here is no requirement that the 'very action in question [have] previously been held unlawful' for a reasonable official to have notice that his conduct violated that right." *Scinto*, 841 F.3d at 236 (second alteration in original) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). Government officials "can still be on notice that their conduct violates established law even in novel factual circumstances, so long as the law provided fair warning that their conduct was wrongful." *Dean ex rel. Harkness v. McKinney*, 976 F.3d 407, 418 (4th Cir. 2020) (internal quotation marks omitted); *see also Hope*, 536 U.S. at 741 (concluding that cases involving "fundamentally" or "materially similar" facts are not necessary to a finding that the law is clearly established).

Indeed, the second inquiry "turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (citing *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)). If the law at the time of the alleged violation was not "clearly established," the official will be entitled to qualified immunity because "an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Harlow*, 457 U.S. at 818. On the other

hand, "[i]f the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Id.* at 818–19.

With these principles in mind, I turn to Peake's assertion of qualified immunity. As discussed, plaintiff sufficiently alleged that Peake violated the Equal Protection Clause by acting with deliberate indifference to the sexual abuse of A.T. by other students. Therefore, for purposes of the qualified immunity inquiry, I "defin[e] the right at issue," *Knibbs*, 30 F.4th at 223, as A.T.'s equal protection "right to be free from a [school] administrator's deliberate indifference to student-on-student sexual harassment." *Hurley*, 911 F.3d at 704. However, the question remains whether that right was clearly established in the fall of 2019.

The parties disagree about whether the principles articulated in *Hurley* gave reasonable notice to Peake that she could not act with deliberate indifference to student-on-student sexual harassment in the circumstances attendant here. Peake contends that *Doe*, 10 F.4th 406, decided after the occurrence at issue here, was the first case decided by the Fourth Circuit that countenanced liability "premised on [a] school's investigations and after-the-fact responses." ECF 24 at 20. According to defendants, *Hurley* merely established an administrator's remedial obligations with respect to *ongoing* sexual harassment. *Id.* at 19; ECF 34 at 7.

Plaintiff responds that the distinction drawn by Peake between "fail[ing] to intervene in ongoing abuse [and] failing to respond to an abuse that has ended . . . is a factual difference without legal distinction." ECF 29 at 20. She reasons that, in both cases, "the administrator is aware that a failure to address student-on-student harassment can violate a student's rights whether further incidents of abuse occur or not." *Id.*

Of import here, *Hurley*, 911 F.3d 674, was decided in December 2018.  In other words, the Fourth Circuit decided *Hurley* about one year before Peake learned, in the fall of 2019, about the abuse of A.T.

In *Hurley*, several female students and student organizations at a public university alleged that they were subjected to various forms of derogatory, sexist, and threatening speech by other students.  *Id.* at 680–685.  The plaintiffs alleged that university administrators "merely responded with two listening circles, a generic email, and by sending a campus police officer with a threatened student on one evening after particularly aggressive and targeted" threats.  *Id.* at 689.  According to the plaintiffs, the failure of Hurley, the university president, to take more adequate remedial action "contravened their equal protection rights." *Id.* at 700. The Fourth Circuit agreed.  It held that "an equal protection claim can be predicated on a [school] administrator's deliberate indifference to student-on-student sexual harassment."  *Id.* at 704.

In *Doe*, 1 F.4th 257, which the Fourth Circuit decided in June 2021, the plaintiff, a female high school student, alleged "that her school's administrators acted with deliberate indifference to reports that she had been sexually [assaulted] by another" student on a bus during a school-sponsored band trip.  *Id.* at 260.  According to the plaintiff, school administrators concluded after investigating that the incident was not sexual assault and declined to take remedial action.  *Id.* at 261–62.  As a consequence, Doe refrained from full participation in band classes in an effort to avoid the student who assaulted her, and went "out of her way to avoid him at school."  *Id.* at 262.  After a jury verdict for the school, the trial court granted Doe's motion for a new trial, and the school appealed, arguing, *inter alia*, that no reasonable jury could find that the school acted with deliberate indifference under Title IX.  *Id.* 270.

The Fourth Circuit concluded that the school's failure to take remedial action in response to the single incident of harassment on the bus could constitute deliberate indifference, even though the harassment itself occurred *before* the school had any notice of it. *Id.* at 273–74.   The Court explained, *id.* at 274 (quoting *Davis*, 526 U.S. at 560) (emphasis added):

> "Even a single incident of sexual harassment, if sufficiently severe, can inflict lasting harms on the victim—physical, psychological, emotional, and social.  And where such harms deprive the victim of the ability to fully participate in or to benefit from the education opportunities provided by their school, and where this deprivation remains unremedied or is compounded as a result of the school's deliberate indifference, the victim surely is 'denied access to educational benefits and opportunities on the basis of gender'—which Title IX clearly prohibits.  *In such situations, the school's inadequate response to the alleged sexual harassment leaves the victim more vulnerable to further harassment.*

According to defendants, *Doe* shows that, notwithstanding its previous decision in *Hurley*, "the Fourth Circuit in 2021 was still debating whether a single, isolated incident of student-on-student sexual harassment . . . could rise to the level of liability based on the school's after-the-fact responses."  ECF 34 at 7.  For that reason, they argue that Peake's "after-the-fact" response, which occurred before *Doe* was decided, could not be deficient under the law that was clearly established at the time.  *Id.* at 8.

In essence, the view of the law that defendants advance is this: under *Hurley* but before *Doe*, a school administrator could be liable for deliberate indifference to student-on-student sexual harassment only if the administrator learned of the harassment while it was "ongoing."  But, if the administrator did not learn of the sexual abuse until after it ended, the administrator's conduct could not be subject to scrutiny for deliberate indifference.  In defendants' view, it follows that, before *Doe* was decided, a school administrator could not commit an equal protection violation if he or she learned of the harassment "after the fact."

I am unpersuaded by this argument.  The harm of sexual harassment consists not only of specific acts, but also the hostile "environment" or "atmosphere" these acts create.  *See Jennings*, 482 F.3d at 696.  It is difficult to define the point at which the harm of sexual harassment is no longer "ongoing."  To be sure, in *Hurley* specific incidents of sexual harassment occurred after administrators received notice of the abuse.  *See* 911 F.3d at 689–90.  And, the administrators' continued failure to intervene despite these additional incidents certainly contributed to their appearance of deliberate indifference.  It would be a mistake, however, to read *Hurley* to provide that the administrators were deliberately indifferent *only because* additional specific incidents of harassment occurred after they declined to take remedial action. The central point under *Hurley* is that an administrator may not ignore the sexual harassment, whether or not it is ongoing, because the harm caused by sexual harassment could persist even after the perpetrator's conduct has ceased.

In this case, plaintiff has alleged that, after A.T. was abused on five separate occasions in her classroom, Peake knew what occurred, yet allowed A.T. to "remain[] in [the same] class" as her abusers, and failed to "protect A.T. from further sexual abuse or . . . separate [her] from the other female classmates who abused her."  ECF 21, ¶¶ 59, 91. Therefore, plaintiff asserts that, "after the fact" of harassment, Peake failed to address an ongoing harm—A.T.'s continued exposure to an environment in which she had already suffered repeated instances of sexual abuse. *Hurley* clearly established that a school administrator has a duty to ameliorate such an environment.  Therefore, it is not appropriate to grant Peake qualified immunity with respect to plaintiff's equal protection claim.

## V. Conclusion

In light of the foregoing, I shall grant the Motion in part and deny it in part. I shall grant the Motion as to Count II, to the extent that plaintiff asserts that Peake is liable under § 1983 for

violating A.T.'s substantive due process right to bodily integrity.  I shall otherwise deny the Motion as to Count II.  And, I shall grant the Motion as to Count III.

An Order follows, consistent with this Memorandum Opinion.


Date: October 12, 2023                                  _____/s/_____
                                                        Ellen L. Hollander
                                                        United States District Judge